SMITH <em>v.</em> BELL, 2 C. C. 152.

Overruling <em>Dupuy</em> v. <em>The United Insurance Company,</em> 3 J. C. 182.

*Abandonment ; Total Technical Loss ; Deduction of One-Third New for Old, where Vessel, after being Stranded, and Damaged to more than Half her Value, was got off and Sold.*

THIS was an action on a policy of insurance for $14,000 on the ship Mary Ann, valued at $14,000. The vessel was stranded on the coast of Scotland, and injured to an extent requiring $7,221, to repair her damage. She was subse-

quently got off, taken into Greenock, and there sold, on account of whom it might concern. The plaintiff gave in evidence the sale of the vessel at Greenock; the purchase by the firm of A. Campbell and Co.; and her reparation at an expense exceeding half her value. The plaintiffs went for a *total technical loss.*

The defendant paid into court, $5,100, contending that they were not liable for a total technical loss; and that as the amount of repairs was only $7,221, and they were entitled to a deduction of one-third, *new for old*, they were chargeable with $4,884 only; which was less than one half of the value of the vessel, as valued in the policy.

The Supreme Court held, upon the authority of the case of *Dupuy* v. *The United Ins. Co.* 3 J. C. 182, that where the repairs are equal to *half the value* and more, the *insured* have a right to abandon *without reference to the deduction of one-third new for old;* and that the deduction applied only to cases of partial loss.

The defendants brought their writ of error, on this judgment, and

The Court of Errors *reversed* the judgment of the Supreme Court.

*Per Curiam,* delivered by Lansing, Chancellor. "On this case, only two questions are presented for the consideration of the court; 1st, whether on a policy of insurance, on the estimate of repairs of a vessel, injured by any of the perils insured against, new materials substituted for the old, do not entitle the insurer to an allowance? And if so, 2nd, at *what period* is the allowance to be admitted?

"These questions are open here. They must, in a great measure, depend upon general reasoning, drawn from the nature of the contract of insurance, and that reasoning may be comprised within very narrow limits."

"In the case of *Da Costa* v. *Newnham,* 2 T. R. 407–415, determined in the British Court of King's Bench, since the revolution, the usage which obtained with respect to the repairs of allowing one-third, new for old, seems to have been acknowledged; and it is now urged in argument, that at any rate, whether or not the defendant was entitled to this allowance, 'was a question for the jury, *as it depended upon*

*usage.*' Buller, J., speaks of it as a "usual allowance," and Ashhurst, J., observes, that the allowance of one-third of the repairs, *is the rule*, where the ship is repaired and delivered over again to the owner for his benefit. That case arose *on a technical total loss*, which the insured did not avail himself of, by abandoning. The recovery was for an average loss of upward of 80 *per cent.* The ship had been repaired at the instance of the underwriters. They refusing to pay for the repairs, a *bottomry* bond was executed on the vessel, in consequence of which she was sold to satisfy the debt."

"It was contended that the value of one-third of the repairs ought to be deducted, and the answer to this, which appears to me conclusive, was, that the repairs, having added to the value of the vessel, must have been compensated for, in the sale on the bottomry bond; and as the owners never had the ship, so they could not be the better for the repairs."

"The rule that constitutes the loss of more than one-half the value of the subject insured, a total loss, is a positive one, originating in the convenience of having a determinate and precise test in all cases."

"From the nature of the contract of insurance, I think the allowance for replacing the old material with the new, is reasonable and proper, and if so, that as the deduction is professedly made on the principle that the value of the subject insured, has been enhanced to that amount, that deduction ought to be made, *before* the test of *total technical loss* is applied; for the doctrine of total technical loss or not, is expressly founded on the position that the subject has been deteriorated more than one half."

"I am therefore of opinion that the judgment of the Supreme Court should be *reversed.*"

The majority of the court concurred in the *reversal.*

---

☞ In this case, an *abandonment* is not *expressly* stated, though the vessel was sold at Greenock, by the master, for benefit of whom it might concern. The plaintiff's proofs, as stated by the reporter, and all the circumstances of the case, show that it must have been an abandonment, as it was a *sale of necessity*, without repairs, the vessel having been stranded, and the voyage broken up; in addition to the

heavy amount of damage actually sustained by the vessel herself. "The plaintiffs gave in evidence," the report says, "a subsequent sale of the vessel at Greenock, *on account of those who might be concerned;* the purchase by the firm of A. Campbell & Co.; and her reparation at an expense exceeding half her value." "The plaintiffs went for a total loss."

By what logic, under these circumstances, the Chancellor arrived at his conclusion, that the judgment of the Supreme Court as to the deduction of one-third new for old, ought to be reversed, while professedly acknowledging the correctness of the decision in *Da Costa* v. *Newnham,* although it *was* "decided before the revolution," it is impossible by anything in his opinion to discover. He says of that case, "It was contended that one-third of the repairs ought to be deducted; and the answer to this, which appears to me *conclusive,* was, that the repairs having added to the value of the vessel, must have been compensated for, in the sale on the bottomry bond; and as the owners never had the ship, so they could not be the better for her repairs."

Now, from this language of the Chancellor, *who,* would it be imagined, had made this *answer* to the claim of the underwriters for the deduction of one-third new for old? Why surely, the court; or, at least, the counsel for the *assured?* For who else could make an *answer* to the *underwriters' claim?* And yet, we find this "*answer*" to their claim, which Chancellor Lansing finds so "*conclusive,*" comes from the mouths of their own counsel! It was actually urged by Bearcroft and Law, counsel for the underwriters, (See 2 T. R. 411,) as a reason *for making the deduction!* So absurd was it, that neither Buller, J., nor Ashhurst, J., as we shall presently see, deemed it worthy the least notice. Bearcroft and Law are reported as arguing as follows: "The underwriters are also entitled to allowances which have not been made to them. The principal of these, is the allowance of one-third *new for old.* The usage in that case has been truly stated to be founded on the advantage derived to the owner. To which it is objected *here,* that the owner did not retain possession of the ship, and therefore did not reap any such advantage. But still, he has had the benefit of them, if the ship sold

*for more on account of these repairs, which it must have done.*" p. 411.

And this "*conclusive answer,*" to their *own claim*, comes from the counsel of the underwriters! Is it possible, that a more glaring absurdity could be put forward, than this misapprehension of Chancellor Lansing?

And yet this case of *Smith* v. *Bell*, so reasoned and so decided, laid the foundation—was in fact, the sole foundation in our courts in New York, for the obviously anomalous and arbitrary rule, that the deduction of one-third new for old, should be applied in *all* cases of *total technical loss*, (for to that point it has now come!) to determine the right of abandonment and recovery; whether the vessel had been, or even *could be* repaired or not. Upon so frail and sandy a basis, rests a doctrine which a later Chancellor, (Walworth,) announces authoritatively as a part of the fixed and settled law of the land. In the case of *Dickey* v. *The American Insurance Company*, 3 Wend. 658, that learned judge took occasion to say : "It is a well settled rule of *American Insurance* law, that if a vessel is damaged by any of the perils insured against, so that the necessary repairs to restore her to her former state, and render her seaworthy, will exceed *three-fourths* of her value, before the disaster, the owner is not bound to repair, but may abandon, as for a total loss. This is usually called, he adds, a loss *to more than half her value*, because one-third · of the expense of repairs is deducted, new for old." We shall examine when we come to the succeeding case of *Ogden* v. *The Am. Ins. Co.*, *post*, 263, on what this positive *dictum* of the Chancellor *then* rested, being as it was, *obiter* and *extra causam* in that case ; and we shall also inquire whence that *dictum* has since derived its chief, if not its only countenance and support.

At present let us return, (for our analysis of it, is by no means completed,) to the case of *Smith* v. *Bell*. We have already shown in what light Chancellor Lansing's "*conclusive answer*" to *Da Costa* v. *Newnham*, is to be viewed. Let us now look at the facts of the case a little more closely, to see on what ground the decision of the Court of King's Bench was placed. · Buller, J., reported the facts as follows :

"The amount of the bottomry bond, together with the

interest due, was £678, and the ship sold for 600 guineas." p. 408.   That is, less than the lien for repairs by about £50. Here, then, we see that neither the *owner* or the *underwriters* had any *benefit* from the repairs, as the ship did not bring enough to pay their amount.

"Under these circumstances," the report says: "Buller, J., stated that it had *been agreed at the trial* and he had so stated it to the jury, that there had not been a total loss at *Nice ;* for though the plaintiff had offered and was entitled to abandon, yet in truth he had not abandoned.   Then considering it only as an *average* loss, the question was, whether the underwriters should be liable for the full amount of the insurance?   The bottomry bond was only £600, but the ship never came free into the plaintiffs' hands; for in consequence of the refusal of the underwriters to discharge it, she was obliged to be sold.   He thought that as all the subsequent injury had accrued to the plaintiff in consequence of that refusal, and by which the plaintiff was damnified to the *whole amount of the insurance,* the underwriters were liable.   Then the only remaining question was, how should the *average* be calculated ?"   As to that, he said four or five different methods had been delivered in to him, and were then in court; one of these was a paper delivered by the defendant, which he should at once lay out of the question : for in that, one-third of the sum charged for repairs was taken off, which was the usual sum allowed in respect of *new work* for old.   Now this was never allowed unless the ship got into the possession of the owner again, so that he got her, the better for the repairs.   Therefore that rule did not apply in that case."  2 T. R. p. 408.

This was the case as reported by Mr. J. Buller, to the Court of King's Bench; the questions stated by him, and passed upon with regard to the adjustment of the *average* upon the freight, &c., are foreign to the question under consideration. Let us see from his opinion and that of Ashhurst, J., who also delivered one, whether there is any departure from the above ground.

Ashhurst, J., says, p. 412.   "The plaintiff had declared that he would not advance any money ; and therefore the captain was obliged to raise money on hypothecation.   The

ship was put in the best repair she was capable of, and on her arrival in London, the bond was tendered for payment to the underwriters, but they refused to discharge it; in consequence of which the ship was obliged to be sold; and that put the owner in the same situation as if he had originally abandoned at Nice, and made it a total loss. And now the underwriters contend that they are entitled to the allowance of one-third for the repairs. That indeed is the rule, where the ship is repaired and delivered over to the owner again for his benefit; in such case, it is right that such an allowance should be made upon the ground which has been stated that the owner is put in a better situation than he was before, by having new work for old. But here, as the plaintiff *never has been put into the free possession again* of the ship, and that through the default of the underwriters, he can not be said to have had any benefit from the repairs, and therefore he is not bound to make that allowance."

Buller, J., says: " On the evidence I have no difficulty in giving it as my opinion, that the repairs were undertaken at the risk of the underwriters, and that they were answerable for all subsequent losses. The ship was repaired, by raising money on a bottomry bond. The ship never was in the free possession of the plaintiff from that time; she came home subject to that *onus*. If the underwriter had discharged it, and thereby restored the vessel to the owners, they might then have demanded the usual allowance of one-third new for old. But they refused to do so; in consequence of which the ship was obliged to be sold; and therefore by their neglect, there has been a total loss to the plaintiff."

We believe the learned reader will have found the requisite materials before him, at present, for forming a proper estimate of the respect originally due to the case of *Smith* v. *Bell*, as an *authority*. In a note to the next case, we shall endeavor to ascertain how much additional credit it has become entitled to, from its advanced age; if that can be made to relieve its original infirmities; and how much it has been improved by the subsequent judicial endorsements which are relied on to make it a settled integral part of "American insurance law."